UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ELLEN JANE KUTTEN,<br> individually and on behalf<br>of her daughters and<br><br>MARY ANN ARNOLD and<br>ELSIE MAHLER SCHARFF,<br><br>on behalf of themselves<br>and all others similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>BANK OF AMERICA, N.A<br>and<br>BANK OF AMERICA CORPORATION,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 4:04CV00244 TIA<br>)<br>)   JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)   CLASS ACTION<br>)<br>)<br>)<br>) |

## SECOND AMENDED COMPLAINT

COME NOW Plaintiffs Ellen Jane Kutten, individually on behalf of herself and her

daughters, Alessandra Kutten Cottrell and Louise Kutten Cottrell, and Mary Ann Arnold and

Elsie Mahler Scharff, for themselves and for all other members of the Classes hereinafter

described, by and through counsel, and state and allege as follows:

## INTRODUCTION

1.     (a)   This Class Action is brought by plaintiffs Mary Ann Arnold and Elsie

Mahler Scharff on their own behalf and on behalf of all other members of the Classes defined

below and by plaintiff Ellen Jane Kutten individually on behalf of herself and her daughters

against the defendants arising out of, inter alia, breaches of fiduciary and contractual duties owed

by the defendants Bank of America, N.A. (the "Bank") and the Bank's parent, Bank of America

Corporation, to beneficiaries of certain trusts and other fiduciary accounts within the Bank's

care. In addition, certain claims are asserted by plaintiffs against the Bank on behalf of a

California Sub-Class and a Missouri Sub-Class as defined below. Unless the context indicates

otherwise, the term "Class" includes the members of the "California Sub-Class" and "Missouri

Sub-Class." Plaintiff Kutten asserts no claims herein as a representative of the Class or any Sub-

Class.

        (b)   The Bank prominently and falsely advertises its promise as to how it holds itself

out to persons such as plaintiffs and the members of the Class who do business with its "Private

Bank":

# Bank Of America [Logo] Higher Standards

## THE PRIVATE BANK

# Managing today's complex wealth. Balancing growth, risk, taxes and grandchildren.

As your financial resources increase, perhaps you need more financial resources to manage them.

The Private Bank of Bank of America has greater depth and breadth of wealth management expertise – across the financial spectrum – than any other private bank. Equally important, we bring this expertise together, creating more integrated solutions to your complex needs. And we provide these customized recommendations based on the extraordinary strength and stability of Bank of America.

It's no wonder we've been entrusted to manage, protect and pass on wealth for more than 150 years.

*The Private Bank is dedicated to serving affluent families and individuals with complex wealth management needs. Our experienced advisors customize unique and comprehensive solutions for each individual, integrating world-class investment management, trusts, credit and*

*bank services. We welcome the opportunity to work with you. We invite you to call Caroline Grace at 800.863.9500 or visit www.bankofamerica.com/privatebank.* [Emphasis in original].

(c)   In fact, despite numerous substantially similar promises in the form of advertising, marketing pieces and direct representations to those who established fiduciary accounts with the Bank (and the beneficiaries thereof), as described herein, those promises have been and are being uniformly ignored or deliberately broken.

2.      In particular, in order to maximize the Bank's profits earned from trusts, guardianships, estates and other fiduciary accounts (collectively "Trusts") by which it acted as fiduciary, the Bank conspired with its affiliates and others presently unknown in a business decision to "double dip," by forcing trusts and other fiduciary accounts under the care of the Bank to have their assets re-directed from their historic allocations in individually managed accounts and/or so-called Common Trust Funds and/or other assets, to proprietary mutual funds controlled by subsidiaries of the Bank and the Bank's parent, defendant Bank of America Corporation, and their respective corporate affiliates and subsidiaries (collectively "BAC"). As used herein, the term "Conversion" refers to such wholesale asset re-direction by the Bank into shares of the Nations Funds. At no time has the Bank distributed to plaintiffs or to any member of the Class defined below or other appropriate recipient a final, annual, or periodic account or any other statement fully disclosing the Bank's wrongdoing as described in this Complaint. Further, the defendants' wrongdoing is continuing in nature.  By August 16, 2000, BAC and its affiliates had increased the assets in their Funds to reach $100 billion. On that date the Bank stated:

> Banc of America Capital Management announced today that the Nations Funds family of funds has reached $100 billion in mutual fund assets. This growth was driven by increases in all three types of mutual funds: equity, fixed income and money market.

3.      Historically, the Bank, either through its so-called "Private Bank," now based in St. Louis, MO [1], or through the Trust Departments of it and its predecessors, promoted itself by touting its purportedly highly individualized trust administration and asset management services, all of which was intended to and did lure grantors, testators and others to designate the Bank as a fiduciary for estates, trusts and other fiduciary accounts. In a recent version of such representations, the Bank stated on its website as follows:

**"Customized Portfolio Management. We do not believe in one-size-fits-all. Rather, we understand that your unique needs require an investment portfolio that is specially tailored to meet them.**

**A tailored approach:**
- **Talk to us** – tell us your investment goals and risk tolerance.

- **A tailored solution** – we will design and recommend a portfolio strategy for you based upon your goals, time horizon, income and liquidity needs.

- **Ongoing communication** – we monitor your portfolio and communicate with you on a regular basis to ensure your goals are being met.

**Our equity selection process.**

Our equity selection follows a core growth strategy with a focus on large cap stocks. The foundation of our process is proprietary research. We use a blend of qualitative and quantitative fundamental research to target companies that have long-term growth potential, proven earnings track records, competitive advantages and strong management.

**A perfect fit.**

**We work with you** to ensure your goals are being met and your total financial picture is being considered. Learn more about our investment management process by contacting a **Private Banker** in your area."

---

[1] To consolidate its own position in the Midwest, the Bank's predecessor, Nations Bank, acquired Boatmen's Bancshares, Inc., the parent of Boatmen's Trust Company ("Boatmen's"). The Bank used Boatmen's trust department as the core of its Private Bank, then proceeded to distribute its administrative functions to Private Bank Offices in various parts of the country.

In fact, the plans of the Bank, BAC and their respective predecessors, despite these and substantially similar representations over the years and the implicit incorporation of them in the documents governing the Bank's fiduciary accounts, have been to cut back substantially on such so-called "Customized Portfolio Management" and to direct fiduciary funds, once "captured," into standardized investments such as BAC's proprietary mutual funds, including, *inter alia*, the Nations Funds, as part of the Conversion as described herein and otherwise. Further, few if any of the grantors or others who established fiduciary relationships with predecessors of the Bank, such as the parents of plaintiffs Kutten and Scharff and the grandfather of plaintiff Arnold, envisaged the Bank in its present form; namely, a nationwide behemoth with few of the services typically offered by a fiduciary and implicit in the fiduciary relationship. The defendants have also utilized these captive accounts as targets to market other products and services sold by them, through "Relationship" Managers, their subsidiaries, affiliates and otherwise, including loans, credit cards and deposit accounts, all to defendants' enrichment.[2]

4.     The Settlors of certain of the Trusts at issue, Joseph Kutten and Carolyn Yalem Kutten (parents of plaintiff Kutten), in entrusting their assets to a local bank, in this case, Boatmen's Trust Company in St. Louis, did so based upon personal relationships with officers of Boatmen's, and its predecessors in interest, St. Louis Union Trust Company and Centerre Bank, built over many years. The fiduciary relationship was established because, inter alia, Boatmen's Trust Company and its predecessor banks, held itself out to the settlors and to other prospective customers of fiduciary serves as institutionally and personally suited not only to the stewardship of settlors' assets over multiple generations but looking after their descendants, the plaintiff in

---

[2] For a vivid history of the Bank's voracity for conversions of assets which it held as a fiduciary, see:

this litigation and her daughters. Similarly, the grandfather of plaintiff Arnold, John T. Crowley, through his Last Will and Testament, entrusted his bequeathed assets to a local bank in California, since acquired by a series of banks, now part of Bank of America ("the Crowley Trust").  Also similarly, plaintiff Scharff's father, Nicholas Scharff, and mother, Pauli Scharff entrusted their assets to Boatmen's Trust Company.

5.     Over the years, the Bank and its corporate predecessors swallowed-whole Boatmen's Trust Company, **and** numerous other financial institutions which had fiduciary responsibilities to plaintiffs and members of the Class. Such institutions are referred to herein, collectively, as the "Acquired Banks."  In the process of being digested by the Bank, these formerly independent institutions' fiduciary operations were transmogrified into just cogs in the fee-generating machinery of the Bank and its corporate parent.

6.     In the course of the metamorphosis of Boatmen's Trust Company and other acquired financial institutions into the Bank, the interests of plaintiffs and members of the Class were not represented by caring, knowledgeable trust officers but by so-called "Call Centers" in Dallas and elsewhere manned by lower-level fungible functionaries and other Bank personnel with little or no investment expertise. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank are fictions and have been fictions since the consolidation of the various acquired financial institutions began taking place.  The purpose was clear.  As stated by the Bank's own press release:

> We will win more business from existing Private Bank clients by proactively delivering   cutting-edge   solutions for wealth management, by continuing to win high marks for satisfaction and

---

http://www.bankofamerica.com/newsroom/press/archives.cfm?LOBID=1.

> high touch service, and through the company's financial commitment
> to the Private Bank which will allow for increased  marketing  and
> heightened awareness of the value we bring to each relationship.

7.      At or prior to the time that Boatmen's Trust Company was acquired by the Bank's predecessor, Nations Bank, it was known by the parties to the acquisition negotiations that the successor entity (i.e. Nations Bank) would materially adversely affect the administration of the fiduciary accounts of  plaintiffs Kutten and Scharff and all other Boatmen's fiduciary accounts. Similarly, this was the plan of the defendants with respect to each of the Acquired Banks and their fiduciary functions.

8.      To the best of the knowledge, information and belief of plaintiffs Kutten and Scharff,  neither Boatmen's nor Nations Bank provided to them or other interested parties in connection with other fiduciary accounts venued in Missouri appropriate written notice as provided in §362.331 R.S.Mo. of Boatmen's transfer of fiduciary capacities to Nations Bank disclosing all material facts which disclosed the material adverse affect of such transfer or advising such interested parties (including plaintiffs Kutten and Scharff and members of the Missouri Sub-Class) that they had a right to object to the transfer and, inter alia, obtain a replacement fiduciary.

9.      Plaintiffs  believe and therefore allege that the Bank similarly failed to provide such notice in each of the other instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to such transferred fiduciary capacities.

## THE NATIONS FUNDS

10.    The Nations Funds Trust ("NFT") holds a "family" of approximately 70 mutual fund portfolios, which are proprietary funds nominally operated by NFT and its Board of Trustees. They are, in fact, directed and controlled by BAC and its subsidiaries.

11.    The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves. The Nations Funds are nominally operated by the NFT and its Board of Trustees, a majority of whom are purportedly independent. In fact, the Bank, as the largest single shareholder of record of the various Nations Funds controls all nominees to the NFT Board and therefore is a "control person" with respect to NFT and the Nations Funds, as such term is defined in the federal securities laws.

12.    Certain of such Nations Funds were funded by BAC in substantial part by transferring fiduciary assets pursuant to the Conversion, in effect, "force selling" Nations Funds to the captive trust accounts for which it served as Trustee.  Such funding permitted the affected Nations Funds to have substantial asset bases, an important selling point to BAC in marketing shares in the Nations Funds to other potential purchasers thereof through the Bank and other subsidiaries of BAC. The Nations Funds selected for investment of fiduciary assets by BAC pursuant to the Conversion were intended generally to "mirror" the categories of assets held by the Trusts pre-Conversion, all or most of which were liquidated immediately prior to the Conversion,  either as part of so-called "Common Trust Funds." "Collective Income Funds," or in individually-managed accounts.

8

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to state statutes and common law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) and 28 U.S.C. § 1367.  The amount in dispute exceeds $75,000 exclusive of interest and costs and there is complete diversity of citizenship between plaintiffs, citizens of the states of California, Missouri and Nevada, and each of the defendants. Further, the claims of all members of the Class well exceed $5,000,000. Although a substantial number of members of the Class reside in Missouri, more than two-thirds of the Class members are residents of other states.  The conduct of the defendants as described herein occurred within the State of Missouri and Eastern District of Missouri, as well as in other states including North Carolina, California, Florida and New York. Accordingly, this Court has personal jurisdiction over all the defendants pursuant to §506.500 R.S.Mo.

15.     Venue is proper in this District as many of the acts and practices complained of herein occurred in substantial part in this District, including the establishment of trusts for the benefit of plaintiff Scharff by her late father and mother, as well as for plaintiff Kutten and her daughters by plaintiff Kutten's late parents. Further, Boatmen's Trust Company, a corporate predecessor of the Bank, was based in this District, as was the Bank's "Private Bank."  Further, many of the most significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District.  In addition, a substantial amount of documents relevant to this dispute are located in this District.

16.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

1. (a) Plaintiff Ellen Jane Kutten is a California citizen who has varying interests as beneficiary, contingent beneficiary, as well as co-trustee of several trusts which had been, until recently, managed and controlled by the Bank, its corporate parent and affiliates. In particular, plaintiff is a named beneficiary under trusts created by her parents in this District in 1981 as amended in 1983, 1987 and 1990, namely, the Joseph Kutten Indenture of Trust and the Carolyn J. Kutten Indenture of Trust. In addition, the plaintiff Kutten and her daughters were beneficiaries of trusts established in 1989, namely, the Joseph Kutten and Carolyn Y. Kutten 1989 Grandchildren's Trust (collectively referred to hereinafter as the "Kutten Trusts").[3] Plaintiff Kutten's family's relationship with the Bank and its predecessors, including her

---

[3] The original trustee bank for the Kutten trust and the trusts established by her parents for the benefit of plaintiff's Kutten's daughters was Boatmen's Trust Company which, in turn, was acquired by and merged into Nations Bank, which, in turn, was acquired by and merged with Bank of America, N.A. following such acquisition. On a parallel track, North Carolina National Bank ("NCNB") was similarly making acquisitions until it merged, as Nations Bank with Bank of America, as reflected in the diagram below:



Notwithstanding the foregoing corporate sleight-of-hand, there is little substantive relationship, if any, between the original trustee bank, Boatmen's Trust Company and its successor, Bank of America. Even more significantly, there is virtually no identity of interest between the fiduciary relationship with Boatmen's Trust Company that existed between it and the Kutten Trusts and the one which existed until recently. These circumstances are true with respect to most if not all of the Acquired Banks that have been merged into and are presently a part of the Bank.

grandfather, noted St. Louisan and philanthropist, Charles H. Yalem, spans a period in excess of forty years.  At relevant times, all of the investment decisions of the Kutten Trusts were made by the Bank or entities controlled by its parent, BAC. The handling of the assets of the Kutten Trusts by the Bank has not been materially different from the other trusts and fiduciary accounts of which the Bank was and/or is serving as corporate fiduciary with respect to the Conversion and otherwise as described in this Complaint. Although documents such as the trust agreements establishing the Kutten Trusts or other documents pursuant to which a fiduciary relationship with the Bank was established typically gave the Bank discretion in the investment of fiduciary assets (even in some cases, permitting investments in proprietary funds), none of such documents permitted the egregious behavior described herein.

(b)     Plaintiff Mary Ann Arnold is a Nevada citizen who has varying interests pursuant to the Crowley Trust referred to above including her status as a beneficiary thereof.

(c)     Plaintiff Elsie Mahler Scharff is a Missouri citizen who has varying interests pursuant to the Nicholas Scharff Trusts and the Pauli R. Scharff Revocable Trust referred to above including her status as a beneficiary thereof.

18.     (a)     On information and belief, the Bank is a federally chartered bank domiciled in North Carolina, and is a wholly owned subsidiary of BAC also domiciled in North Carolina. BAC is a financial holding company, and the parent of the Bank.  At all relevant times, BAC dictated and controlled the business activities of the Bank, including, *inter alia*, the wrongful business activities described herein within the Eastern District of Missouri**,** and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.

11

(b)      Although the Bank and BAC now have their principal places of business in Charlotte, NC, BAC continues to conduct substantial business within this District in many locations through its "Private Bank" and elsewhere. Notwithstanding the fact that the Kutten Trusts have been under the fiduciary responsibility of the Bank in St. Louis, BAC and the Bank have bounced the beneficiaries of the Kutten Trusts around the country, most significantly to the Banks' Call Center in Dallas in November, 2002, losing their paper files and accounts for a period of months. When plaintiff Kutten sought to obtain a transfer of the Kutten Trusts' accounts to California in October, 2002, where she resides, the Bank refused. Similarly, the Crowley Trust has been bounced around and the beneficiaries thereof are now "serviced" by a Call Center, rather than fiduciary officers with knowledge of the beneficiaries of the Crowley Trust or their individual needs. As such, the following representations of Kenneth D. Lewis, Chairman and Chief Executive Officer of BAC and the Bank on November 3, 2003 in the context of a new acquisition of yet another bank are baseless:

> The people you know at your branch today will be there tomorrow, and will continue to strive to anticipate and meet your financial needs.

At all relevant times, the Bank was successor Trustee of the Kutten Trusts of which plaintiff Kutten is a beneficiary of one and her daughters another. Similarly, the Bank is successor Trustee  of the Crowley Trust, of which plaintiff Arnold is a beneficiary. The Bank was successor Trustee to the Scharff Trusts, including the Pauli R. Scharff Revocable Trust. The Bank is also Trustee or serving in another fiduciary role with respect to the other Trusts or similar groupings of assets of which the remaining members of the Class defined below are beneficiaries.

19.     NFT, a non-party herein, is the holding/operating entity BAC formed to do business as the Nations Funds. Its principal place of business is located in Charlotte, NC. Although nominally independent and supervised by its Board of Trustees, NFT has at all relevant times been operated as an alter ego of BAC and its subsidiaries. Upon information and belief, all the members of the Board of Trustees of NFT were selected and/or approved by BAC and its subsidiaries.

20.     Defendant BAC (through its subsidiaries) and other business entities not owned by defendant BAC individually and collectively, charge substantial fees and expenses to the Nations Funds for their purported services which, together with NFT's own operating expenses, have had and continue to have a substantial cost to the Kutten Trusts, the Crowley Trust, the Scharff Trusts and to each of the other fiduciary accounts, the assets of which have been invested in one or more of the Nations Funds.

### Defendants' Self-Serving Investment Decisions

21.     (a)     Historically, the Bank and its predecessors invested the assets comprising the Kutten Trusts, the Crowley Trust, the Scharff Trusts and those of members of the Class primarily through individually managed portfolios and/or through so-called "Common Trust Funds" or "Collective Investment Funds." The expenses of the Bank for such investment and related administrative services were absorbed by the Bank out of its fees for serving as fiduciary. Beginning some time prior to 1998, in order to, inter alia, compensate for massive losses it was incurring from its traditional lending business, the Bank and its predecessors developed various plans and schemes pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and maximize their profit from fiduciary business. Upon information and belief, former Bank Chief Executive Officers, Hugh McColl and Kenneth

13

Lewis, were significant motivating forces behind these plans, which were integral to their master plan of extracting higher profits from the Acquired Banks and consolidating their various trust department and "wealth management" activities under the banner of the so-called "Private Bank." Defendants' plan included the consolidation and elimination of the previously existing trust departments of the Acquired Banks with the objective of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel and greater standardization of investments in fiduciary accounts. Pursuant to such business plans, they decided, *inter alia*, to utilize the funds held by the Bank in fiduciary accounts to fund an initial group of mutual funds and/or to add assets to such funds controlled by the Bank's corporate parent, BAC, the Nations Funds, as well as other mutual funds merged into them, which Ted Scharch, a Bank Vice President, described as "owned" by the Bank. Thereafter, due to numerous acquisitions, mergers and other transactions referred to above, consistent with its longer-term plan and scheme, BAC determined that most or all of the assets in certain fiduciary accounts held by the Bank (and formerly held as fiduciary assets by the acquired banks) such as the accounts of the Kutten Trusts, the Crowley Trust and the Scharff Trusts, would be converted again into proprietary funds such as the "family" of Nations Funds (or other of the Bank's proprietary mutual funds), the management and investment decisions of which were controlled by subsidiaries of BAC and by the Board of NFT, which was itself controlled and dominated by the defendants.

(b)     Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, BAC engineered a scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary responsibilities, functions and services to beneficiaries of fiduciary accounts in favor of alternatives that resulted in higher total direct and indirect expense charges to the fiduciary

14

accounts (such as those of the Kutten, Crowley, and Scharff Trusts) as compared to the trustee or similar fees historically paid to the Bank for, *inter alia*, active management of the Trusts' assets. As indicated below, beginning in February 2000 and continuing for some time thereafter, the Bank's "Private Bank" began sending out standardized form letters informing some co-trustees, beneficiaries of the fiduciary accounts and others of the Bank's planned closing of its "Common Trust Funds" and touting the so-called "benefits" of the Conversion, which was then anticipated to take place in May 2000 or at other dates on a carefully orchestrated plan nationwide based, in part, upon the level of integration of the previously acquired banks and other factors. All of these Conversions were carried out on a rolling basis and did not differ from each other in any material way. Such letter, signed by David W. Fisher, President, also coerced the recipients of the letter to authorize the Conversion of the Trusts' assets into shares in the Nations Funds. In particular, the Bank's letter said:[4]

> Using Nations Funds, we can provide trust and fiduciary accounts with an attractive mix of investments to pursue the accounts' investment goals. Nations Funds also offer the benefits of:
>
> > Daily valuation and liquidity
> > Newspaper performance listings
> > Broader potential diversification

---

[4] It is not presently known whether the Bank sent such a letter to beneficiaries of all of its fiduciary accounts (it appears that this was not the case) or, in the case of guardianships and similar accounts, to the appropriate courts overseeing such accounts. Further, not all co-trustees received such a letter nor were their consents sought by the Bank. While the manner in which the conversion was carried out by defendants may have been different from state-to-state and/or based upon the identity of the acquired bank, such differences were immaterial. Further, "trust officers" were required, pursuant to a carefully orchestrated plan, to convey the identical information to members of the Class and to similarly threaten them with adverse tax consequences and other "horrors" if they did not indicate their consents to the Conversion. Each such oral solicitation of consent to the Conversion misrepresented the Bank's reasons for carrying it out, concealed the increased investment-related expenses that would be incurred by the Bank's fiduciary accounts post-Conversion and misrepresented that so-called "credits" that the Bank would thereafter apply to fiduciary accounts would be sufficient to compensate for all such additional expenses. Further, as with the prospectuses and other documents provided to beneficiaries and co-fiduciaries, the Bank concealed all the benefits it would derive from the Conversion, including those derived from "bulking-up" the Nations Funds, profits from securitization of advisory fee income, and from utilizing the Nations Funds to benefit corporate customers of the defendants at the expense of the holders of Nations Funds shares.

Flexibility when making trust distributions

In fact, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary accounts and this letter was a sham.

Indeed, all such so-called "benefits," could have been accomplished by means of the Bank's "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds will be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis. The Bank's letter went on to threaten coercively:

> Any common trust fund units for which we have not received an authorization [by May 1, 2000] may be liquidated and the proceeds placed in a money market vehicle pending discussion about reinvestment. This liquidation could have adverse tax consequences depending upon the cost basis of the common trust fund units.

22. Although plaintiff Kutten did receive some documents seeking authorizations for conversions, in response to such coercion and the deceptive and unclear information provided by the Bank in the disclosure/authorization forms, upon information and belief, Kutten, co-trustees and beneficiaries of other fiduciary accounts who received it, signed the enclosed form, thereby providing to the Bank their uninformed and fraudulently induced "consent" to the Conversion. Undisclosed to those who received the Bank's Conversion document package was the fact that, whether or not consent was obtained, the Bank planned to proceed with the Conversion. In the case of Plaintiff Kutten, she explicitly stated that despite her "consent" to the conversion, the Bank was not authorized to "double charge" her account.

23. Enclosed with the Bank's letter sent to some Trust beneficiaries and/or co-Trustees were various prospectuses and other documents which were drafted so as to conceal,

16

*inter alia*, the motives of the Bank and BAC for the Conversion into BAC proprietary mutual funds, the benefits of the Conversion to them and their subsidiaries or the increased costs and expenses that would be incurred by the Trusts as a result of the Conversion. There was no explanation in plain English that would put the recipients of these documents on notice of the Bank's wrongdoing as referred to herein. In fact, one of those documents, (Form 3.05D 7/1999) entitled "Disclosure of Investment in Nations Funds," stated deceptively:

> The fee paid directly by the [Trust] Account to the Bank will be reduced (but not below zero) by the Account's pro rata share of the investment advisory fees paid by the Funds to the Service Providers; provided however, that the amount of the reduction will be based on Bank of America Corporation's percentage ownership of the Service Provider. From time to time, the Bank may elect to reduce the Account's fees in recognition of amounts paid by Nations Funds for other services (such as administrative services), but it is not obligated to do so, and the amount of any such fee reduction may vary. The Account will not be charged a sales "load" for buying or redeeming Fund shares described in the accompanying prospectuses.

Such doubletalk-laden form went on to state:

> I acknowledge receipt of the current prospestuses for the Funds and a Nations Funds Fee Disclosure Statement. As co-fiduciary for this account, I understand that the Service Providers will be paid investment advisory and other fees by the Funds. **I approve the method for reducing the investment management fees paid to the Bank by the Account**. I understand and agree that the Bank may choose not to reduce the Account's fee on the account of the compensation paid by the Funds for other services, but the Bank is electing to do so at this time.  [Emphasis added].

In fact, the Bank and the lawyers who drafted these documents used such language to conceal the fact that although in many cases there was a credit for certain of the post-Conversion investment advisory fees to be incurred by fiduciary accounts, the credits were insufficient to overcome the substantially higher expenses that fiduciary accounts would bear post-Conversion and that the

Bank intended to reduce or eliminate the credit as soon as practicable thereafter once consents were obtained and/or the Conversions completed. Further, in many other cases, there was no credit for the fiduciary fees charged by the Bank. Despite the outward appearance of independence of NFT and its legal counsel, who may have performed or been involved with the physical tasks of "drafting" them, the content of the Nations Funds prospectuses was effectively dictated by BAC, the Bank and their subsidiaries. Indeed, with respect to the prospectuses used by the defendants for the Conversions, Robert Hitpas, a Senior Vice President of the Bank as well as one who was responsible for overseeing numerous fiduciary accounts including the Kutten Trusts, found them daunting, full of legalese, fine print and difficult to read. Another Bank Senior Vice President, Paul Hundt, reacted similarly and it is believed that many, if not most of the Bank's "trust officers" could not understand many of the material terms of the Conversion and what was set forth in the prospectuses of the Nations Funds provided to beneficiaries of fiduciary accounts in connection therewith.

24.     Apparently as a result of an agreement among the defendants, there was no credit for the substantial operating expenses of the proprietary mutual funds, which substantially reduced the net investment returns to fiduciary accounts, such as the account of the Kutten, Crowley and Scharff Trusts. At no place in any of the prospectuses the defendants issued to beneficiaries of fiduciary accounts in connection with the Conversions did they disclose that, post-Conversion, all fiduciary accounts affected by the Conversion would be forced to bear substantially higher investment-related expense levels post-Conversion than those which preceded it, even allowing for whatever credits the Bank applied to its fees for serving as fiduciary.   Indeed, upon information and belief, most of such credits, to the extent given, have now been substantially reduced on a nationwide basis.

25.     Upon information and belief, despite its ability to dictate the content of the Nations Funds prospectuses, at no time following the foregoing "disclosure" did the Bank make any complete and candid disclosure of the full extent of the damages caused to the fiduciary accounts by the Conversions or other improper investments in the Bank's proprietary funds. Further, the defendants made no disclosure of the true motives of the defendants in carrying out the Conversions or the full extent to which the defendants were profiting unjustly therefrom and, in particular, the additional assets which would flow into the Nations Funds and other proprietary mutual funds, making them more saleable to the investing public generally. Even after the Bank applied a so-called credit against its fees for some portion of the advisory fees charged to some of the proprietary funds to some fiduciary accounts, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others to understand and have knowledge of the true cost of the Conversions to the fiduciary accounts and the income earned upon their assets.  Indeed, plaintiffs Kutten, Arnold and Scharff and certain other beneficiaries have sought to obtain such information or other similar information relating to the expenses of investing the assets of fiduciary accounts in the defendants' proprietary mutual funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of such investments upon them and their fiduciary accounts.

26.     Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-Trustee, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversion (although many of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that plaintiffs or

others similarly situated understood the extent to which the Bank and BAC would benefit from the Conversion and how the Kutten, Crowley, and Scharff Trusts and other fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's trustee and similar fees. Indeed, Mr. Fisher's letter of August 31, 2000 sent to beneficiaries of fiduciary accounts transmitting the Prospectus for the Nations Funds was "for information" only and recipients, including Plaintiff, were told: "**you do not need to take any action."** [Emphasized in original].

27.     Notwithstanding its overarching  duty of loyalty to plaintiffs and members of the Class, upon information and belief, at no time following the foregoing "disclosure" did the Bank make any complete and candid disclosure to the beneficiaries of the Trusts of the full extent of the damages caused to the Trusts or their beneficiaries by the Conversion, the true motives of BAC and the Bank in carrying out the Conversion or the full extent to which the Bank and BAC were profiting therefrom and, in particular, the additional assets which would flow into the Nations Funds, making them more saleable to the investing public generally. Even after the Bank applied a so-called credit against its fees for some portion of the Nations Funds advisory fees, in practical terms, it was (and is) impossible for co-trustees, executors, beneficiaries and others to understand and have knowledge of the true cost of the Conversion to the Trusts and the income earned upon the assets of the Trusts. Indeed, plaintiffs and other beneficiaries have sought to obtain such information from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of the Conversion upon them.

28.     Upon information and belief, no analyses or determinations were made by the Bank as to the suitability and/or propriety of the relative costs and benefits of investments in

BAC's proprietary funds at the time or before the Conversions were carried out for each fiduciary account as compared to pre-Conversion investments including any comparisons with numerous other available mutual funds or investment vehicles in which the Bank could have invested prudently and at lower cost the funds of the Trusts in which plaintiffs and the members of the Class were beneficiaries. Even assuming that the Bank made a prudent decision to purchase shares in the Nations Funds, which plaintiffs do not contend that it did, upon information and belief, the Bank did not negotiate the fees and expenses to be charged to the Trusts by the Nations Funds or comparison shop in any significant way with other funds or families of funds in an attempt to obtain the same or better investment services elsewhere.  Upon information and belief, any "comparisons" that were done by the Bank were merely to "paper" the file so it would appear that a true effort was made to consider investments in alternative mutual funds or mutual fund families. Similarly, neither NFT nor its Board of Trustees, sought to obtain the lowest fees from the subsidiaries of BAC actually operating the Nations Funds. Indeed, as stated by New York's Attorney General Eliot Spitzer: "Fund directors do not – and cannot – negotiate hard on the fees."  This is particularly the case when, as here, all of NFT's Trustees were nominated and voted upon by the Bank, which totally controlled the composition of NFT's Board. As such, NFT and the entire Board of Trustees of NFT, aided and abetted by defendants, breached the fiduciary duties owed to plaintiffs and the members of the Class and, by reason of their knowledge of the defendants' motives for the Conversion, were themselves *de facto* fiduciaries.

29.    Upon information and belief, BAC and the Bank specifically excluded alternate investment vehicles (such as other families of funds such as the Vanguard and Fidelity mutual funds specifically requested by plaintiffs Kutten and Arnold) from their considerations in order

to maximize their earnings and those of their corporate affiliates and did not give serious consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available. Similarly, at no time did BAC and the Bank give any consideration to making changes in the Bank's "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversion.  The requests of Plaintiffs Kutten, Scharff and Arnold and other beneficiaries of the Bank's fiduciary accounts for changes in investments were repeatedly rebuffed. [5]

30.    On information and belief, as a result of a conspiracy among the defendants and others presently unknown, the Bank and BAC, as part of a corporate business decision, chose to invest the fiduciary assets of plaintiffs and the members of the Class in shares of the Nations Funds as part of the Conversion and otherwise in order, inter alia, to generate investment advisory fees and other fees for its various affiliates and to "bulk-up" the Nations Funds without regard to whether such investments were prudent and in the best interest of plaintiffs and the other beneficiaries of fiduciary accounts.

31.    The foregoing Conversion of the assets of fiduciary accounts to the Nations Funds and the investment of fiduciary assets therein generally was carried out in furtherance of BAC's corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing BAC's overall direct and indirect profits from fiduciary operations. The assets in the fiduciary accounts managed by the Bank, including the Kutten, Crowley, and Scharff Trusts, were particularly vulnerable to misuse since BAC and the Bank regarded the fiduciary accounts in their care as a "cookie jar" open for the taking. BAC and the Bank proceeded to carry out the Conversion since

---

[5] Plaintiff Kutten, although nominally a co-trustee with the Bank, was typically ignored in her role as such and her

they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through BAC's related asset management business and otherwise. Additional profit was also generated by adding the assets in the Bank's fiduciary accounts to the Nations Funds following the Conversion, thereby making them more saleable at retail to the investing public. Further, the Conversion created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate affiliates.

32.     The Bank and its affiliates reaped many millions of dollars in purported money management, investment advisory and other fees as a result of the Conversion and thereafter from the investment of fiduciary assets in the Nations Funds and the securitized cash flow therefrom. The Bank also benefited by receiving Trustee or similar fees for serving as a fiduciary and by reason of the benefits which flowed from, *inter alia*, substantially reduced operating expenses of the Bank's fiduciary operations. Despite these benefits to the Bank and its affiliates, these investments have been of little benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including plaintiffs and the members of the Class. On information and belief,  plaintiffs and all members of the Class suffered damages from the investment practices of the Bank as described above in an amount which cannot presently be determined but which is capable of calculation.

---

consent was not sought by the Bank for the Conversion.

## CLASS ACTION ALLEGATIONS

### The Relief Sought for Members of the Class

33.     This action is brought by plaintiffs Arnold and Scharff, individually and on their

own behalf and on behalf of all others similarly situated, under the provisions of Federal Rules

of Civil Procedure Rules 23(a) and 23(b)(3) for: (i) an accounting which determines all damages

caused by defendants to the members of the Class and the extent of the unjust enrichment of the

defendants from their wrongful activities;  (ii) money damages, including punitive damages, to

be paid by the defendants; (iii) injunctive relief providing for the possible removal of the Bank as

fiduciary for all fiduciary accounts in which members of the Class are beneficiaries; (iv)

injunctive relief providing for new procedures and practices at the Bank which put the interests

of plaintiffs Arnold, Scharff and the members of the Class ahead of those of BAC and the Bank

and which otherwise address the ongoing conflicts of interest forced by the Bank in the

investment of fiduciary assets; and (v) for relief incident and subordinate thereto, including the

costs and expenses of this action and an award of attorneys' fees to plaintiffs' counsel. Excluded

from the Class are all persons who are members of any certified Class in <u>Williams v. Bank of</u>

<u>America, N.A. et al.</u>, Case No. 02-15454AB pending in the Circuit Court of the 15th Judicial

Circuit in and for Palm Beach County, Florida.

### Numerosity of the Class

34.     On information and belief, the Bank serves as a fiduciary (such as a trustee,

guardian, executor, etc.) for many thousands of Trusts and other fiduciary accounts affected by

the wrongdoing described herein.

35.     The Class represented by plaintiffs Arnold and Scharff consists of all persons who are, or were at any time from the time of the Conversion to the present ("Class Period"), beneficiaries of Trusts for which the Bank is or was a fiduciary, including inter alia, the remainder beneficiaries, the assets of which were "converted" into shares of the Nations Funds. The California Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or involved beneficiaries residing in California (such as plaintiff Arnold). The Missouri Sub-Class consists of accounts originated in (as in plaintiff Scharff's case) and/or involved beneficiaries residing in Missouri. Such definitions are subject to modification upon completion of discovery with respect thereto.

36.     The exact number of members of the Class and California and Missouri Sub-Classes as above described is not known by plaintiffs, but is within the sole knowledge of the Bank. On information and belief, there were and are at least 30,000 fiduciary accounts controlled by the Bank with, collectively, more than 45,000 beneficiaries thereof, approximately 10% of which are members of the California Sub-Class and 10% of which are members of the Missouri Sub-Class. These approximations are subject to discovery and the exact number of Class members is readily ascertainable from the Bank's records.

37.     On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries. Similarly, members of the California and Missouri Sub-Classes are located throughout Missouri, California and in many other states.

38.     The beneficiaries of the affected Trusts are so numerous that joinder of individual members is impracticable.

### Common Issues of Law and Fact Predominate

39.     On information and belief, at least two years prior to the Conversion, the Bank, at the direction of its parent, BAC, and in conspiracy with others, including, upon information and belief, former Chief Executive Officers Hugh McColl and Kenneth Lewis as part of the plans for the Acquired Banks and their respective fiduciary operations,  decided to invest the assets of the affected Trusts in shares of the Nations Funds, all of which were directly or indirectly "advised" and managed by subsidiaries of BAC. It is believed that such Conversions were carried out nationwide on a rolling basis subject to a master plan developed by the defendants and others. None of such separate Conversions differed materially despite the timing and different locales of each.

40.     All members of the Class and Missouri and California Sub-Classes were adversely affected by the Bank's self-serving business decision to invest the Trusts' assets in the Nations Funds and other proprietary mutual funds pursuant to the Conversion or thereafter.

41.     All Trusts, the assets of which were converted into shares of the Nations Funds, paid directly or indirectly, management and investment advisory fees and other charges to subsidiaries and affiliates of BAC, based on the fiduciary assets invested by the Bank in the Nations Funds.

42.     There are common questions of law and fact that relate to and affect the rights of each member of the Class including, inter alia:

(a)     whether the Bank's business decision to invest assets of the Trusts and other fiduciary accounts in the Nations Funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by BAC's desire to generate management and investment advisory fees for its affiliates and subsidiaries, to lower the Bank's

26

expenses of managing fiduciary assets and to generate other benefits for themselves by inter alia, "bulking-up" the assets invested in the Nations Funds;

(b)     whether the Bank breached fiduciary duties to plaintiffs Arnold and Scharff and the Class by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act and other applicable law;

(c)     whether the Bank breached its fiduciary duty to all members of the Class by making investment decisions for the Trusts based upon defendants' own interests and those of their affiliates, rather than the interests of Trust beneficiaries; and,

(d)     what remedies are appropriate compensation for the damages caused to plaintiffs and each member of the Class.

43.     The relief sought is common to the entire Class including, inter alia:

(a)     a declaratory judgment that the Bank violated its fiduciary duty as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts and whether it was aided and abetted by defendant BAC and others in doing so;

(b)     payment by the defendants of compensatory damages caused by such breaches of fiduciary duty as well as punitive damages;

(c)     payment by the defendants of the costs and expenses of this action, including  plaintiffs' attorneys' fees;

(d)     an injunction preventing the Bank from opposing a petition by beneficiaries of the Trusts affected by the Conversion and other wrongdoing referred to herein to replace it as fiduciary; and

(e)     an injunction which establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of Trusts are fully protected from wrongdoing such as described herein.

**Typicality of the Claims of Plaintiffs Arnold and Scharff**

44.     Plaintiffs Arnold and Scharff  have been beneficiaries of fiduciary accounts affected by the wrongdoing of the Bank as described herein.

45.     The assets of the Crowley and Scharff Trusts, like all other Trusts and similar fiduciary accounts, were invested by the Bank in the Nations Funds pursuant to a wholesale business policy decision by BAC made some time prior to 1999 and carried out by the Bank and others thereafter pursuant to the Conversion and subsequently regardless of whether the underlying fiduciary accounts "resided" with the Bank or one of its predecessor banks.

46.     On information and belief, the Crowley and Scharff Trusts, like all other Trusts and similarly situated fiduciary accounts, were used by the Bank and its affiliates to generate additional management, investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied as a result of certain Nations Funds advisory fees) without regard for the best interests of the beneficiaries of such accounts such as plaintiffs and the members of the Class.

47.     The claims of plaintiffs Scharff and Arnold, who are representatives of the Class and the Missouri and California Sub-Classes, respectively,  are typical of the claims of all members thereof. The claims of plaintiffs Scharff and Arnold are based on the same factual allegations and legal theories as the claims of all other members of the Class and the Missouri and California Sub-Classes.

28

**Plaintiffs Arnold and Scharff Will Fairly and Adequately Represent the Class and the Missouri and California Sub-Classes**

48.     Plaintiffs Scharff and Arnold are able to and will fairly and adequately protect the interests of the Class and the Missouri and California Sub-Classes respectively.

49.     The attorneys for plaintiff Scharff and Arnold are experienced and capable in complex litigation. The attorneys for plaintiffs Scharff and Arnold and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## COUNT ONE

## BREACH OF FIDUCIARY DUTY

50.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

51.     On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiffs and the Class members but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses and to generate additional revenues from securitizing cash flows derived from the Nations Funds.

52.     On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds (or deliberately did not do so) when it invested the assets of the Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts.

53.     On information and belief, the Bank failed to consider the best interests of the Trust beneficiaries when it invested the Trusts' assets in the Nations Funds and breached its duty

29

of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiffs and the members of the Class.

54.     The Bank's wholesale investment of the assets of the Trusts in the Nations Funds in the Conversions carried out around the country was a breach of its fiduciary duty to plaintiffs and the members of the Class, which breach was aided, abetted and/or directed by BAC and its affiliates.

55.     As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Trusts into shares of the Nations Funds, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT TWO

## BREACH OF CONTRACT

56.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

57.     By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten, Crowley, and Scharff Trusts and each of the other Trusts affected by the Conversion, the Bank and its predecessors committed to provide to all such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Kutten's parents, plaintiff Arnold's grandfather, plaintiff Scharff's father, and the other creators of the Trusts and the needs of the beneficiaries thereof. As the Bank states: **"It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document."  Such promise by the Bank and its predecessors was a material implied term of**

**each trust agreement or other document which established the underlying fiduciary relationship.**  No grantor of a Trust anticipated or could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets that the Bank would mishandle fiduciary assets as described herein or that the designated fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to the investments made for them by the Bank and otherwise.

58.     Plaintiffs and each member of the Class were and/or are beneficiaries of the Bank's contractual obligations to the creators of the Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" or "Collective Investment Funds" in favor of the wholesale Conversion of fiduciary assets as described herein that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations thereto.

59.     By virtue of the Bank's breach of its contractual obligations to the members of the Class and Missouri and California Sub-Classes, plaintiffs and the members thereof have suffered damages in an amount to be determined by the Court.

## COUNT THREE

## BREACH OF CONTRACT

60.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

61.     This Count is brought by plaintiffs on behalf of those members of the Class who are beneficiaries of Trusts originally established with the designate trustee being one of the banks acquired by and/or merged into the Bank or its predecessors i.e. the Acquired Banks.

62.     As with the trusts established by plaintiff Scharff's parents with Boatmen's Trust Company as designated corporate Trustee or by plaintiff Arnold with the Bank of Santa Monica as designated corporate Trustee, the grantors of all affected Trusts selected as Trustee institutions which promised and agreed to deliver personalized fiduciary services to the beneficiaries thereof. Implicit in the contractual fiduciary relationship between the grantors and the Acquired Banks was the provision of a full range of personalized fiduciary services, including individualized investment management.

63.     The Bank, by eliminating the personalized fiduciary services to members of the Class, including, *inter alia*, individualized investment management, materially breached the explicit and implied terms of the Indentures of Trust or similar documents which initially caused the formation of such Trusts, including, but not limited to the following:

(a)     failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including a uniform failure to invest in appropriate asset classes;

(b)     bouncing plaintiffs and others similarly situated to poorly manned and anonymous "Call Centers" with whom there was no pre-existing relationship, trust and fealty;

(c)     changing without plaintiffs' and others similarly situated consent representatives of the Bank to deal with plaintiffs who had no knowledge of plaintiffs' circumstances and others similarly situated or the purposes for which the Trusts were established; and

(d)     continuing to charge fiduciary fees when failing to perform the services
the services that the Acquired Banks had agreed to perform.

64.     Because the transfer of fiduciary responsibilities from the Acquired Banks
substantively and materially affected the pre-existing fiduciary relationship with the Bank, it was
obliged to give notice to Class members of, <u>inter alia</u>, the terms of the merger or business
combination, the forthcoming material changes in the relationship and provide to them the
opportunity to seek a replacement fiduciary.

65.     By virtue of the foregoing lack of appropriate notice and the material change in
fiduciary services delivered by the Bank to members of the Class following the acquisition of the
Acquired Banks, such notice should now be provided to affected beneficiaries which, <u>inter alia</u>,
provides them with the opportunity to seek a replacement fiduciary.

<u>**COUNT FOUR**</u>

<u>**UNJUST ENRICHMENT**</u>

66.     Plaintiffs repeat and reallege each and every allegation contained above as if fully
set forth herein.

67.     By reason of defendant BAC's causing the Bank's fiduciary assets in affected
accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The
defendants have profited by the Conversion and the subsequent acts described herein, thereby
unjustly enriching themselves at the expense of plaintiffs and the members of the Class and
Missouri and California Sub-Classes. Defendants have similarly enriched themselves, their
subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts
to market through "Relationship" Managers and otherwise various goods and services including
credit cards, loans and deposit accounts (and to permit certain customers of the defendants to

33

engage in late trading and other improper practices involving the Nations Funds) from which products and services they have been unjustly enriched. They also unjustly enriched themselves by secretly securitizing the revenues they derived from the Nations Funds, thereby generating additional and hidden profits.  In Plaintiff Scharff's case, the Bank needlessly obtained a mortgage from the Bank when the Trust account had more than sufficient assets to pay for the Grantor's home without a mortgage.

68.    Such "double dipping" was carried out by the Bank and BAC by, *inter alia*, imposing on fiduciary accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated  by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment and administrative responsibilities owed to the members of the Class and Missouri and California Sub-Classes. The Bank enhanced its profit performance at plaintiffs' expense by favoring the use of its own Nations Funds and investing in same to increase the Nations Funds' own asset base, and aggrandize its own stature under the guise of allegedly providing more services to participants in its so-called "Private Bank."  The Bank's objectives were clear from its telling press release of July 14, 1999:

> United by the merger of Bank of America and NationsBank, NationsBanc Investments, Inc., and BA Investment Services, Inc., became one brokerage company on July 12. The birth of Banc of America Investment Services, Inc., the new name for the retail brokerage, gives investors a powerful ally within the Bank of

America franchise. (For the full press release, see http://www.bankofamerica.com/newsroom/press/press.cfm?PressID=press.19990714.03.htm&LOBID=1>).

69.     Further, upon information and belief, with respect to at least certain of the Trusts for which the Bank has acted as Trustee, the total charges against such Trusts for trustee fees/commissions, advisory fees and other amounts payable by the Trusts exceed the contractual amounts for such charges agreed upon by the creators of such Trusts.

70.     The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Trusts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the years of misappropriation) pursuant to California Probate Code, Section 166440(a)(1) and otherwise. Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to plaintiff Scharff and others in the Missouri Sub-Class for their damages. (§362.550.5 R.S.Mo.). Plaintiffs and others similarly situated are entitled to recover the Bank's ill-gotten gains and profits therefrom.

## COUNT FIVE

## VIOLATION OF CALIFORNIA PROBATE CODE

71.     Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth in Counts Five through Seven are asserted on behalf of the California Sub-Class.

72.     Pursuant to Section 16002 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class an absolute duty of

loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the interest of the beneficiaries.

73.     Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold and each member of the California Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the best interests of the beneficiaries, i.e. the members of the California Sub-Class.

74.     Pursuant to Section 16060 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of candor.

75.     Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of candor.

76.     By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to 16400 of the California Probate Code.

77.     Pursuant to Section 16004 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty not to use or deal with Trust property for its own profit, nor to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Arnold and the members of the California Sub-Class.

78.     Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold a duty not to take part in a transaction in which it had a conflict of interest, as it did and does as described above.

79.     By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with Trust property for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Section 16400 of the California Probate Code.

80.     Pursuant to Section 16040 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of care that includes the duty to invest Trust assets prudently and with regard to individualized strategy appropriate and productive pursuant to Probate Code Sections 16007 and 16009. Pursuant to Probate Code Section 16014, the Bank is required to apply fully the special skills of a corporate fiduciary, and this duty heightens the duty of care otherwise applicable to it.

81.     By acting as alleged herein, the Bank has violated and continues to violate the duties of care and productivity it owes and owed to plaintiffs and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

82.     Pursuant to Section 16420 of the California Probate Code, plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

83.     Pursuant to Section 16440 of the California Probate Code, the Bank is liable to plaintiff Arnold and the members of the California Sub-Class for actual and punitive damages, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT SIX

## BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

84.     Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     Pursuant to Section 15002 of the Probate Code, the common law of California with respect to fiduciary and trust matters remains the law of the State of California, and Probate Code Section 16420(b) expressly preserves "any other appropriate remedy provided by statute or the common law."

86.     By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to plaintiff Arnold and the members of the California Sub-Class.

87.     By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it does here.

88.     By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiff Arnold and the members of the California Sub-Class.

89.     By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff Arnold and the members of the California Sub-Class to take and exercise control over Trust assets.

90.     The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from plaintiff Arnold and the members of the California Sub-Class, in an amount which cannot be presently determined.

91.     Pursuant to Section 16420 of the California Probate Code, plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

92.     The Bank's unlawful conduct, breach of fiduciary duty and breach of contract have, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

93.     The unlawful acts and practices of the Bank as alleged herein, including violations of  violation of Section 16400 of the California Probate Code as well as other state and federal law,  constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

94.     Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, plaintiff Arnold and the other members of the general public

residing within the State of California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

95.     So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to plaintiff Arnold and the other members of the general public residing within the State of California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

### COUNT SEVEN

### VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

96.     Plaintiffs Kutten and Arnold repeat and reallege each and every allegation contained above as if fully set forth herein. Plaintiffs Kutten and Arnold assert this cause of action in their capacity as private attorneys general on behalf of the members of the general public residing within the State of California and/or whose Trusts originated there and, in the case of plaintiff Arnold,  on behalf of the members of the California Sub-Class.

97.     The Bank has engaged in and continues to engage in unfair, unlawful and deceptive business practices, including but not limited to sending representatives from St. Louis, Missouri to meet with plaintiff Kutten in Northern California, whereby it has conspired with BAC and its affiliates to force the Kutten and other trusts to have their assets re-directed from individually managed accounts and/or so-called "Common Trust Funds" and/or other assets to proprietary mutual funds controlled by the Bank and its affiliates. Said Conversions have resulted in higher total direct and indirect expenses charged to fiduciary accounts than those historically paid to the Bank.

98.     By acting as alleged herein, the Bank has violated its duties as a fiduciary, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

99.     The unlawful acts and practices of the Bank as alleged herein, including violations of Section 16400 of the California Probate Code, constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

100.     Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose Trusts originated in California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

101.     So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose Trusts originated in California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

## COUNT EIGHT

## VIOLATION OF CHAPTER 456 AND 469 MISSOURI REVISED STATUES

102.     Plaintiff Scharff repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth in Counts Eight and Nine are asserted on behalf of the members of the Missouri Sub-Class.

103.     Pursuant to §456.520.2 R.S.Mo., (now  §456.8 -802 R.S. Mo. 2004 and §456.900, now  469.900  et. seq. R.S.Mo. 2004 to the extent it supplements prior law) ("The Prudent Investor Act")  R.S.Mo., the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to

administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

104.    Pursuant to §456.905 R.S.Mo., (now §469.905) the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by the Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

105.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets..

106.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

107.    Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo. (now 456.8-802 R.S.Mo. 2004), the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Scharff and the members of the Missouri Sub-Class.

108.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any

transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

109.    Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

110.    By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff Scharff and those similarly situated.  Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

111.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and unless enjoined from doing so, they will continue indefinitely to extract unlawful fees and other charges from the members of the Missouri Sub-Class, in an amount which cannot be presently determined in violation of §456.907 R.S.Mo. (now  §469.907 R.S. Mo. 2004.)

112.    Plaintiff Scharff and the members of the Missouri Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

113.    The Bank is liable to plaintiff Scharff and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Scharff's and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT NINE

## BREACH OF FIDUCIARY DUTY UNDER MISSOURI COMMON LAW

114.    Plaintiff Scharff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.    Pursuant to the common law of Missouri, the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty.  In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

116.    By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to plaintiff Scharff and the members of the Missouri Sub-Class.

117.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it did and does here.

118.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiff Scharff and the members of the Missouri Sub-Class.

119.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff Scharff and the members of the Missouri Sub-Class to take and exercise control over fiduciary assets.

120.     Plaintiff Scharff and the members of the Missouri Sub-class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

121.     The Bank's unlawful conduct, breach of fiduciary duty and breach of contract have damaged plaintiff Scharff and the members of the Missouri Sub-Class, inter alia, resulting in waste and mismanagement of fiduciary assets, self-dealing and its consequent unjust enrichment.

122.     The Bank is liable to plaintiff Scharff and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Scharff's and others' rights,, attorneys' fees, interest and such other relief as the Court may order.

## COUNT TEN

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF FIDUCIARY DUTY

123.     Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

124.     As noted above, plaintiff Kutten's family wealth commenced with the toils of her grandfather, Charles H. Yalem, who founded the Aetna Finance Co., later sold to International Telephone and Telegraph Corporation in 1960.  Yalem, always a conservative investor, donated hundreds of thousands of dollars to St. Louis civic endeavors, including the St. Louis Zoo (the Charles H. Yalem Children's Zoo), St. Louis University, Jewish Hospital of St. Louis, Washington University, the St. Louis Symphony Orchestra and the St. Louis chapter of the YMCA.  Yalem's experience with predecessors to the Bank commenced at least with St. Louis Union Trust which became Centerre Trust Co, which became Boatmen's Trust Co. Yalem's net worth was achieved as a result of a passion for cautious investing and he instilled in his son-in-

44

law and daughter, Joseph and Carolyn Kutten, plaintiff Kutten's parents, the wisdom of careful and conservative investing so that future generations of the family might enjoy his good fortune. In turn, plaintiff Kutten's parents passed these virtues on to her. The Kutten family employed the St. Louis law firm of Bryan, Cave, McPheeters and McRoberts n/k/a/ Bryan Cave to draft the Kutten Trusts and represent them on estate planning matters.  The relationship of the Kutten family was not only with their trust company, it was with the individuals who represented the trust company who understood and appreciated the desires and needs of the entire family, including plaintiff Kutten, a single mother of two children, as well as one of her brothers, a disabled person who is institutionalized and has special needs.  The Kuttens had long term personal relationships with several individuals, including Bank Senior Vice Presidents Robert Hitpas and Richard Klapp. These individuals and their successors are no longer responsible for the portfolios entrusted to them.  Instead, the Bank boasts of a minimum of 450 faceless employees who answer customer inquiries at "Call Centers" established around the country.  The systemic change that occurred at the Bank when it acquired the predecessor banks and converted trust assets without the consent of plaintiff Kutten for its own gain and profit represents a classic instance of self-dealing and breach of loyalty, the antithesis of conduct expected of a fiduciary. The Bank has breached its fiduciary duties to plaintiff Kutten and her daughters, including the duty of loyalty, and various duties highlighted by the federal regulations issued by the Office of the Comptroller of the Currency in 1996 directed to all national banks that act in a fiduciary capacity, with which the Bank failed to comply.[6]   The Bank:

(a)      failed to exercise such specialized care and skill as is required of a fiduciary;

---

[6] Plaintiff Kutten asserts no private cause of action thereunder.  Rather, the Bank's failure to comply with them is a

(b)     converted trust assets and their subsequent purchase of the Bank's proprietary mutual funds, the Nations Funds;

(c)     failed to properly diversify investment portfolios of the Trusts, and acting in derogation of the settlor's expressed directions;

(d)     failed to adopt appropriate policies relevant to self-dealing and conflict of interest as required by and in violation of 12 CFR Part 9;

(e)     failed to preview the prospective account to determine if the account could be properly administered subsequent to the acquisition of Boatmen's Trust Co. by the Bank as required by and in violation of 12 CFR, part 9.6;

(f)     failed to properly invest funds waiting to be invested to obtain yields consistent with a reasonable rate of return as required by and in violation of 12 CFR Part 9.10;

(g)     failed to assign at least two individuals to plaintiff Kutten's accounts as required by 12 CFR, part 9.13;

(h)     charged excessive fees for fiduciary compensation in violation of 12 CFR part 9.15;

(i)     failed to properly supervise personnel entrusted with the management of plaintiff Kutten's Trusts' assets to ensure implementation of the grantors' expressed directions;

(j)     failed to make appropriate trades in the equity and bond markets to enhance the achievement of the objectives of the Trusts, including failing, through neglect, to make trades of any kind for several years;

(k)     failed to establish a written plan to engage in the sale and marketing of Nations Funds to Trusts under its fiduciary control and failed to absorb the expenses of

---

fundamental breach of fiduciary duty.

establishing a collective investment fund, instead charging the beneficiaries, including plaintiff Kutten a fee of not less than 0.01%;

(l)     failed to consider and advise the beneficiaries of the adverse tax consequences arising from a conversion of trust assets and the subsequent purchase of Nations Funds;

(m)     failed to consider alternative investments in funds whose returns and ratings are higher than Nations Funds which has scored low on nationally respected ratings;

(n)     created a wholly owned subsidiary to serve as the sole vendor of its own product to Trusts under its fiduciary management and control;

(o)     failed to resign as Trustee when demanded to do so by plaintiff Kutten, citing its need for business income as overriding its performance as a fiduciary duty and resigning only after plaintiff Kutten's citation of the innumerable occasions when the Bank had breached its duty to plaintiff Kutten and the Kutten Trusts;

(p)     failed to observe the parameters of the instructions with regard to conversion issued by the Federal Reserve Bank of the United States in SR 97-3 (SPE), providing [i]n determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interests of the organization and the fiduciary." Further, the Federal Reserve noted the existence of potential conflicts of interest for a national bank to engage in such transactions and the need for management to demonstrate that it has determined that the governing trust instrument for each affected customer authorizes investment in mutual funds and the mutual funds are suitable investments for the particular accounts;

(q)     lost administrative control of plaintiff Kutten's accounts for an undetermined period of time in 2202 and 2003, including electronic access to the accounts and the paper files relating to same; and

(r)     failed to communicate with the plaintiff Kutten, return her phone calls and letters and failed to perform as requested by plaintiff Kutten with respect to modifying investment strategies consistent with the investment philosophy that reigned in her family for decades.

## COUNT ELEVEN

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF FIDUCIARY DUTY

125.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

126.    On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiff Kutten and her daughters but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

127.    On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds when it invested the assets of the Kutten Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts maintained for the Kutten Trusts.

128.    On information and belief, the Bank failed to consider the best interests of plaintiff Kutten and her daughters when it invested the Kutten Trusts' assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiff Kutten and her daughters.

129.     The Bank's wholesale investment of the assets of the Kutten Trusts in the Nations Funds was a breach of its fiduciary duty to plaintiff Kutten and her daughters, which breach was aided, abetted and/or directed by BAC and its affiliates.

130.     As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Kutten Trusts into shares of the Nations Funds, the accounts of plaintiff Kutten and her daughters for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT TWELVE

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF CONTRACT

131.     Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

132.     By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten Trusts, the Bank and its predecessors committed to provide to such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Kutten's parents and the needs of the beneficiaries thereof. As the Bank states: "It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document." No grantor of a Trust anticipated or could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets or that the designated fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to investments and otherwise.

133.    Plaintiff Kutten and her daughters were beneficiaries of the Bank's contractual obligations to the creators of the Kutten Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations to plaintiff Kutten, her parents and daughters.

134.    By virtue of the Bank's breach of its contractual obligations to plaintiff Kutten, her parents and her daughters, plaintiff Kutten and her daughters have suffered damages in an amount to be determined by the Court.

135.    The Bank has breached its contractual obligations to plaintiff Kutten and her daughters in their individual capacities as a result of its failure to adhere to the terms of the Kutten family's engagement of the Bank and its predecessors as a fiduciary and plaintiff Kutten as well as her daughters have been damaged.

## COUNT THIRTEEN

### INDIVIDUAL CLAIM OF PLAINTIFF BREACH OF CONTRACT

136.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

137.    This Count if brought by plaintiff Kutten as a beneficiary of Trusts originally established with the Boatman's Trust Company, being one of the Banks acquired by and/or merged into the Bank.

138.    Boatmen's Trust Company, as designated corporate Trustee, promised and agreed to the settlers of the Kutten Trusts and its beneficiaries to deliver personalized fiduciary services.

Implicit in the contractual fiduciary relationship between the plaintiff Kutten's parents and Boatman's Trust Company was the provision of a full range of personalized fiduciary services, including individualized investment management.

139.    The Bank, by eliminating the personalized fiduciary services to plaintiff Kutten, including, *inter alia*, individualized investment management, materially breached the explicit and implied terms of the Kutten Trusts, including, but not limited to the following:

(a)    failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including failing to invest in appropriate asset classes;

(b)    bouncing plaintiff Kutten to poorly manned and anonymous "Call Centers" with whom these was no pre-existing relationship, trust and fealty;

(c)    changing without plaintiff Kutten's consent representatives of the Bank to deal with plaintiff Kutten who had no knowledge of plaintiff Kutten or the purposes for which the Kutten Trusts were established; and

(d)    continuing to charge excessive fiduciary fees when failing to perform the services the services that Boatman's Trust Company had agreed to perform.

140.    Because the transfer of fiduciary responsibilities from Boatman's Trust Company substantively and materially affected the Kutten Trusts' pre-existing fiduciary relationship with the Bank, it was obliged to give notice to plaintiff Kutten of, inter alia, the terms of the merger between it and Nations Bank, the forthcoming changes in the relationship and provide to them the opportunity to seek a replacement Trustee.

141.    Although not provided with said notice, plaintiff Kutten sought the resignation of the Bank in early October, 2003.  In response, on October 17, 2003, the Bank incredibly insisted that they be allowed to remain a trustee:

> The (Bank's) Committee decided that they would not resign from these trusts.  It was a business decision that was based on the fact that Bank of America does not want to give up your business.  Bank of America, like everyone else, has felt the effects of the poor economy and has become very reluctant to voluntarily resign as trustee.

142.    The Bank continued to resist resignation until plaintiff Kutten's counsel wrote a seven page letter citing the many examples of the Bank's breach of duties in the administration of the trusts of plaintiff Kutten and her daughters.

## COUNT FOURTEEN

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN UNJUST ENRICHMENT

143.    Plaintiff  Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

144.    By reason of defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC  have "double dipped." The defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of plaintiff Kutten and her daughters.  Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the plaintiff Kutten to market various goods and services including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

145.    Such "double dipping" was carried out by the Bank and BAC by imposing on plaintiff Kutten's accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the

Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets, for which services its Trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment responsibilities owed to plaintiff Kutten and her daughters. The Bank enhanced its profit performance at plaintiff Kutten's expense by favoring the use of its own Funds and investing in same to increase its own asset base, and aggrandize its own stature under the guise of allegedly providing more services to participants in its "Private Bank"  The Bank's objectives were clear from its telling press release in July 14,1999:

> United by the merger of Bank of America and NationsBank, NationsBanc Investments, Inc., and BA Investment Services, Inc., became one brokerage company on July 12. The birth of Banc of America Investment Services, Inc., the new name for the retail brokerage, gives investors a powerful ally within the Bank of America franchise.  (For the full press release, see http://www.bankofamerica.com/newsroom/press/press.cfm?PressID= press.19990714.03.htm&LOBID=1>).

146.    The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Kutten Trusts as the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the years of misappropriation).  Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to plaintiff Kutten for their losses.  §362.550.5  R.S.Mo.  Plaintiff Kutten and her daughters are entitled to recover the Bank's ill-gotten gains and profits.

## **COUNT FIFTEEN**

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN
## <u>VIOLATION OF CHAPTER 456 MISSOURI REVISED STATUES</u>

147.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

148.    Pursuant to §456.520.2 R.S.Mo. and §456.900 *et. seq.* R.S.Mo. ("The Prudent Investor Act")  RSMo. (recently re-codified at §456.900, et. seq. R.S.Mo 2004 to the extent her claims are supplemented thereby), the Bank owes and owed to plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

149.    Pursuant to §456.905 R.S.Mo.,(recodified at 469.905 R.S. Mo. 2004) the Bank owes and owed to plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Kutten Trusts governed by the Missouri law solely in the best interests of the beneficiaries.

150.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

151.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Kutten and her daughters.  Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

152.    Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo. (recently recodified as  §456.8-802 R.S. Mo. 2004), the Bank owes and owed to plaintiff Kutten and her daughters a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Kutten and her daughters.

153.    By acting as alleged herein, the Bank violated the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

154.    Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters  a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

155.    By acting as alleged herein, the Bank has violated the duties and productivity it owed to plaintiff Kutten and her daughters. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

156.    Plaintiff Kutten may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

157.    The Bank is liable to plaintiff Kutten for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Kutten's rights, attorneys' fees, interest, and such other relief as the Court may order.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs Arnold and Scharff  respectfully request on their own behalf and on behalf of all members of the Class and Missouri and California Sub-Classes and plaintiff Kutten requests on behalf of herself and her daughters:

(a)    certification of this action as a Class Action and appointment of plaintiffs' and their counsel to represent the Class and the Missouri and California Sub-Classes;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of plaintiffs individually and plaintiffs Arnold and Scharff  as  representatives of the other members of the Class and Missouri and California Sub-Classes and against the defendants and an award of compensatory damages and punitive damages in favor of plaintiffs individually and as representatives of the other members of the Class and Missouri and California Sub-Classes and against the defendants in the amount of damages caused by the defendants' breaches of fiduciary duties;

(c)    entry of judgment on the claims for breach of contract in favor of plaintiffs individually and plaintiffs Arnold and Scharff as representatives of the other members of the Class and Missouri and California Sub-Classes against the Bank and an award of compensatory damages in favor of plaintiffs individually and as representatives of the other members of the Class and Missouri and California Sub-Classes and against the Bank in the amount of damages caused by the Bank's breaches of contract;

(d)     entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class or Missouri or California Sub-Classes seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)     entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including the Kutten, Crowley and Scharff Trusts, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)     entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC;

(g)     entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, inter alia, the appointment of an ombudsman to oversee the Bank's fiduciary operations;

(h)     repayment to the affected Nations Funds of the damages caused to them by the defendants' actions as described herein;

(i)     pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)     reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to  members of the Class and Missouri and California Sub-Classes; and

(k)     such other or additional relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

June 29, 2005

GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, Maryland
(410)745-4149
(410) 745-4158 (Fax)

Lead Counsel for Plaintiffs and the Class

SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

/s/ Steven M. Hamburg
STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)

GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy M. Boomhouwer
144 W. Colorado Blvd.
 Pasadena, CA 91105
(626) 685-9800

COUNSEL FOR PLAINTIFFS AND THE CLASS

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June, 2005, I caused a copy of the foregoing to be served upon Defendants' counsel via the Court's electronic filing system to the following:

Jeffery S. Russell, Esq.          Gregory B. Jordan, Esq.
Jason E. Maschmann, Esq.          Mary J. Hackett, Esq.
Bryan Cave LLP                    Sharon L. Rusnak, Esq.
One Metropolitan Square           Reed Smith, LLP

211 N. Broadway, Suite 3600          435 Sixth Avenue
St. Louis, MO 63102                   Pittsburgh, PA 15219


/s/ Steven M. Hamburg
_____


384544_1.DOC